Filed 11/12/14  In re Alexis A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re ALEXIS A., a Person Coming Under the Juvenile Court Law. | |
| | D066047 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1061C/E) |
| v. | |
| LETICIA P., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Leticia P. (Mother) appeals a juvenile court's order denying her Welfare and Institutions Code[1] section 388 petition seeking placement of her children Alexis A. and Liliana A. with her. The Mother also appeals an order terminating her parental rights, arguing the parental-child relationship and the sibling relationship exceptions apply. We affirm.

FACTUAL AND PROCEDURAL HISTORY

The Mother has five children: Allen, age 16; Joanna, age 14; Alexis, age 10; Victor Jr., age 9; and Liliana, age 2. The Mother began receiving voluntary services nearly a decade ago after Victor A. (Father) was physically abusive to Joanna. This appeal only concerns the Mother's youngest two daughters: Alexis and Liliana.[2] However, we discuss the other siblings for context and to provide sufficient background to address the Mother's contentions.

From February 2005 to August 2005, the family received voluntary services as a result of a substantiated referral for physical abuse. The Father had hit his stepdaughter, Joanna, and she received injuries to her left eye. Alexis and the three siblings were removed from the Mother's care; however, they were later returned on the condition the Father move out. Two years later, in 2007, law enforcement took the children to a local

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2]     The juvenile court found Victor A. to be the presumed father of Alexis and Liliana. He was also found to be the father of Allen and Victor Jr., but not Joanna. All references to the Father in this opinion are to Victor A. He has not appealed.

2

shelter because the Mother left them in the Father's care and he was intoxicated. The Father was arrested and the children were returned to the Mother.

In June 2011, the San Diego County Health and Human Services Agency (Agency) received another referral for this family: Joanna reported her stepfather had sexually abused her by digitally penetrating her vagina and fondling her breast while she was watching TV. Allen, the eldest sibling, witnessed the molestation. It was also alleged the Father had been physically abusive to the children.

The Mother was offered voluntary services, including in-home parenting education, individual therapy, sexual abuse counseling, and crisis intervention services. The Mother's participation was lackluster. She never followed through with taking Joanna and Allen to trauma-focused therapy, and she did not enroll herself in individual therapy.

In January 2012, the Agency received yet another referral alleging physical abuse by the Father and general neglect by the Mother. Victor Jr. disclosed the Father was living in the family home, hitting him every day, and had locked him in a room without any food. He was fearful of the Father.

The Mother denied the Father was living in the home, but admitted she had seen him in or around her home and did not call the police to enforce the active restraining order. The siblings reported being beaten by the Father with objects and the Mother was unable to protect them from him. At one point, the Mother denied that Joanna had been sexually abused.

3

In February 2012, the Agency filed a petition on behalf of Alexis alleging the Mother failed to provide adequate care and protection because she allowed the Father back in the family home even though Joanna reported he sexually abused her and there was an active restraining order against him. Additionally, upon the Father's reentry in the family home, he hit Victor Jr. with cable cords and/or a belt, and he continued to abuse alcohol. The Agency filed petitions on behalf of all the children and detained them in out-of-home care.

The Agency's jurisdiction report dated February 24, 2012 recommended Alexis remain in out-of-home care with the maternal aunt, Josephine P. Josephine was willing to keep Alexis and her siblings as long as necessary and was willing to adopt them if the Mother failed to reunify. The Mother was happy the children were living with Josephine.

The Mother reported she started parenting classes through Community Services for Families (CSF[3]); however, the service provider indicated the Mother was very slow to learn or give examples to demonstrate she was assimilating the lessons. In fact, on several different occasions when the CSF service provider went to the Mother's home for lessons, the home was exceedingly filthy and unsanitary and the floors were filled with

---

[3]     "The [CSF] program provides services to families who need assistance and support surrounding issues of child abuse. Services include in-home parenting education and parenting classes using evidence-based models proven to be effective. In addition, CSF has Parent Partners, individuals who have previous Child Welfare Services (CWS) involvement who provide education and encouragement to parents who are currently receiving services through CWS. The goal of the CSF program is to promote child safety, child well-being and stable living environments." (<http://www.saysandiego.org/programs/programdetails.asp?id=11>[as of November 6, 2014].)

dog feces and urine. A 2008 psychological evaluation revealed the Mother was diagnosed with mild intellectual disability, and different providers opined the Mother had a limited ability to provide the minimum level of safe care for her children. San Diego Regional Center (Regional Center) attempted to contact the Mother to assess her for services; however, she failed to return its calls as well as the social worker's calls.

In addition, the Mother claimed she did not enforce the restraining order against the Father because police informed her it was not valid. She acknowledged the Father molested Joanna and admitted she knew the reason her children were removed was because she let him back in the home. At this time, the Mother was pregnant with a child conceived while the Father was not supposed to be in the home. Although the Mother claimed she did not think she would get back together with the Father, she very soon thereafter raised her hand at an Agency social worker in defense of the Father and called her children liars for accusing him of molesting Joanna.

On March 15, 2012, the court sustained the petitions on behalf of Alexis and her siblings, declared the children dependents, and placed them in relative care, with Josephine. It ordered reunification services be provided and supervised visits for the parents.

On April 9, 2012, the Agency filed a petition on behalf of newborn Liliana. The child was detained in relative care with her siblings. On May 31, the court sustained the petition. It subsequently declared the child a dependent, ordered services, and placed Liliana in relative care.

5

By September 2012, the Mother was making "minimum progress" in services because of her "mental limitations" and "great attachment to the [F]ather." The Mother was participating with in-home CSF services as well as services for nonprotective parents of sexual abuse. Yet, she had difficulties focusing on topic discussions and expressed limited interest.

On September 5, 2012, the juvenile court held the six-month review hearing for Alexis and the older siblings. The court found a return of Alexis and the siblings to parental custody would be detrimental and the services provided had been reasonable. It continued placement with Josephine, with another six months of reunification services.

By March 2013 the social worker reported the Mother continued to have contact with the Father despite the restraining order. The Mother participated in a psychological evaluation, which concluded she had a mental disability that prevented her from adequately caring for her children. The evaluator further concluded that the Mother "fail[ed] to recognize, almost entirely, the impact that her behaviors have had on her children, as she cannot understand cognitively, nor empathize emotionally, with their suffering."

On April 8, 2013, the juvenile court held the contested 12-month review for Alexis and the contested six-month hearing for Liliana. It found a return of the girls to parental custody would be detrimental and continued their placement in relative care. The court terminated services for the Mother, but continued services for the Father for another six months.

By July 2013, the matter was at the 12-month mark for Liliana and the 18-month mark for Alexis and her two brothers, Allen and Victor Jr. The Agency asked the court to set a section 366.26 hearing for the two sisters as well as Victor Jr. With respect to 14-year-old Allen, the social worker recommended another planned permanent living arrangement as the permanent plan.

Liliana and Alexis remained placed together with Josephine. Alexis had lived with Josephine since February 1, 2012. She was happy in her care and wanted to remain there. Alexis was getting all of her basic needs met by her aunt and was thriving in an environment free from drugs, alcohol, physical abuse, domestic violence, and sexual abuse. Liliana had been doing well with Josephine, where she had been living together with Alexis, since her birth in April 2012.

Allen was on a runaway status and a pick up and detain warrant had been issued. He had been engaging in criminal behaviors, such as theft and selling narcotics at school and a local park. The child admitted his substance abuse began at the age of three, when the Father gave him marijuana and alcohol. At the age of 11, he began selling drugs. Allen had a lot of anger toward his father, which led him to drug use, drug sales, bullying his sisters, making holes in the wall, stealing, and running away. At a team decision meeting, the participants agreed Allen should be placed in a group home setting.

Victor Jr. had been in the foster family agency (FFA) home since August 2012. Victor Jr. took psychotropic medications for attention deficit hyperactivity disorder (ADHD) as well as his impulsivity and aggression. He was a client of the Regional Center. The child participated in therapy to help with self-control. Victor Jr.'s tendencies

to hurt animals had decreased, but he did try to put his hands around the dog's neck. The caregivers were unable to adopt Victor Jr. because of their age, but the caregivers' daughter wanted to adopt him.

As of July 2013, the Mother reported she continued to live with a friend. She visited the children every other day and the visits were supervised by one of the maternal relatives. The Mother helped with cooking and cleaning of Josephine's home. The Mother admitted having contact with the Father, despite the no contact order. He told her he still loved her and wanted her to move in with him

The Mother had not made substantive progress following the termination of her services in April 2013. Similarly, the Father had not consistently participated in services. In August, he finally admitted molesting Joanna.

Josephine reported she was interested in adopting Alexis and Liliana along with Joanna and Allen. She had helped the Mother in caring for the children for many years.

On September 25, 2013, the Father was arrested for possession of a stolen vehicle. He entered a guilty plea and was awaiting sentencing. The social worker recommended termination of services for the Father.

On October 29 and November 6, 2013, the court held the contested 18-month review for Alexis and the contested 12-month review for Liliana. It found a return of the girls to parental custody would be detrimental and the services provided had been reasonable. The court terminated court-mandated reunification services for the Father and scheduled a hearing under section 366.26 to select and implement a permanent plan.

Jose Santana, a social worker, prepared the assessment report dated February 18, 2014. He recommended adoption for Alexis and Liliana, and a 60-day continuance for Victor Jr. to allow time to locate an adoptive home that could meet his special needs. Victor Jr. had been diagnosed with ADHD and mild intellectual disability. He also displayed some autism symptoms. Victor Jr. initially lived with Josephine (and Alexis) from March 1, 2012 to July 9, 2012. Josephine requested his removal after the child engaged in aggressive, self-injurious, and out-of-control behaviors. Thereafter, weekly visits were arranged by the caregivers for Victor Jr. and his siblings. Joanna continued to live in the same relative placement with Alexis and Liliana.

Santana described Alexis and Liliana as developmentally on target. He opined they were likely to be adopted due to their young age, good health, and outgoing personalities. Josephine had an approved adoptive home and was committed to adopting the girls; she was already in the process of adopting their older sister, Joanna. At the time of the assessment report, the Mother had been visiting Alexis and Liliana on a daily basis in Josephine's home. The visits were supervised by either Josephine or another maternal relative. When Santana asked Alexis where she wanted to live, the child replied she did not know.

In concluding his report, Santana noted this was the second dependency proceeding for this family. The first one took place in 2007, and the Mother was able to reunify. Although the Mother visited daily, she had been unable to meet the children's needs. On balance, Santana opined Alexis and Liliana would benefit more from a permanent plan of adoption.

9

The matter came before the court for the section 366.26 hearing on March 3, 2014. The parents objected to the recommendation for adoption and the case was set for trial.

On May 5, 2014, the Mother filed a section 388 petition asking the court to return Alexis and Liliana to her care. As changed circumstances, she alleged she attended eight sessions of individual therapy and was receiving independent living services through the Regional Center. The juvenile court found the Mother had not met her prima facie burden and summarily denied the petition.

In his final addendum report dated May 5, 2014, Santana continued to recommend adoption for Alexis and Liliana. He acknowledged the children had a sibling bond, but nonetheless opined adoption was the best plan.

The court held the contested section 366.26 hearing on May 15 and May 19, 2014. The parents were present with counsel. The court received into evidence the Agency's reports, discussed above, and heard testimony from Santana. Santana told the court Alexis and Liliana were visiting with Victor Jr. once a week. The Agency was in the process of looking for an adoptive home for Victor Jr. and searching for one that would allow ongoing sibling contact. The relative caregiver, Josephine, for Alexis, Liliana, and Joanna was willing to continue sibling visits. Victor Jr. remained in his FFA foster home placement. Josephine was already in the process of adopting Joanna and was committed to Alexis and Liliana as well. Josephine had an approved adoptive home study.

With respect to Allen, Alexis and Liliana had not had regular contact with him during the preceding months due to his criminal activities and delinquency matter. At the time of trial, Allen was living in a group home. The social worker opined on balance the

10

benefits of adoption to Alexis and Liliana outweighed the benefit they would receive from maintaining the sibling relationships with Allen and Victor Jr.

The Mother had maintained regular contact with Alexis and Liliana. Santana had observed over 10 visits between the Mother and the girls. The Mother did not share a close relationship with Liliana. Alexis was nine years old and told Santana she did not know where she wanted to live. Santana noted Alexis stated that she would like visits with the Mother and Father to continue. Nevertheless, Santana recommended termination of parental rights when considering the long-term benefits of adoption for Alexis and Liliana.

After considering the evidence presented and hearing argument from counsel, the juvenile court found by clear and convincing evidence the girls were likely to be adopted and none of the statutory exceptions applied. It terminated parental rights and referred the children to the Agency for adoptive placement.

The Mother timely appealed.

DISCUSSION

The Mother raises three issues in this appeal. First, she contends the juvenile court abused its discretion when it failed to conduct a full evidentiary hearing on her section 388 petition. Second, the Mother asserts the juvenile court erred in finding that the beneficial parent-child relationship exception did not apply when the court terminated her parental rights. Finally, the Mother argues the juvenile court erred in finding that the beneficial sibling relationship did not apply when it terminated her parental rights. We reject these contentions.

11

I

*SECTION 388 PETITION*

Under section 388, subdivision (a), a parent, interested person, or the dependent child (generically, petitioner) may petition the court to change, modify, or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner requesting the modification has the burden of proof to show a change of circumstances or new evidence, and that the proposed modification is in the child's best interests. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

We review the grant or denial of a petition for modification under section 388 for abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Although the abuse of discretion standard gives the trial court substantial latitude, " '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' " (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119, citing *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.) We will not disturb a discretionary decision unless the lower court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) The complaining party must affirmatively establish abuse of discretion; it is never presumed. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

The focus of a petition for modification under section 388, subdivision (a) is whether the petitioner has shown a legitimate change of circumstances. "The parent need

12

only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Ca1.4th 295, 310.) However, the court has the discretion to deny the request for a section 388 hearing if the moving party has not met his or her threshold burden of proof. (*In re Jasmon O.*, *supra*, 8 Ca1.4th at p. 415.) In deciding whether the petition makes the necessary showing, the juvenile court may consider the entire factual and procedural history of the case. (*Ibid.*)

"The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

Here, the Mother contends she presented ample evidence to warrant at least an evidentiary hearing on her section 388 petition. To this end, she emphasizes that she had been participating in individual therapy from March 20 to May 1, 2014. She also states that she sought out the therapist on her own and paid for her sessions in a timely manner.

The Mother's therapist reported that the Mother had, in sessions, processed her feelings of remorse and guilt about her inability to protect her children from their father's abusive behaviors. She demonstrated understanding that her inability to ask for help when she was unable to break from the cycle of abuse between her and her husband affected all of her children negatively.

The Mother indicated that she would continue her individual therapy sessions and case management services with the Regional Center. She also provided a letter dated April 25, 2014, from the Regional Center confirming that she had been a client there since August 1994. The letter also made clear that the Mother was eligible for the

13

Regional Center's services based on her diagnosis of moderate intellectual disability. And she was receiving independent living services, which allowed the Mother to work closely one-on-one with an instructor who could help her develop a budget, help her plan meals, provide reminders about housecleaning and self-care, help ensure she was making and attending medical and dental appointments for herself and her children as well as help her access resources for her children as needed.

Although this evidence shows that the Mother may be changing, in light of the entire record, we are not persuaded that the Mother has shown changed circumstances. For example, the Mother ignores that since 1999, there had been 15 referrals for child abuse and/or neglect, including physical abuse, caretaker absence, sexual abuse, and a dirty home environment. The Mother had a long history of neglecting her children and being unable to make substantive progress. The Mother's ability to adequately parent was limited by her mild intellectual disability. Also, the Mother continued to have contact with the Father despite the restraining order.

We focus on this evidence not to weigh it against the evidence offered by the Mother, but to provide some context for the juvenile court's decision. Indeed, the juvenile court went to great lengths to carefully explain why it was summarily denying the Mother's section 388 motion. To this end, the court made clear that it understood the Mother had a "very low" burden for a prima facie showing under section 388, but stated that "at best" the Mother made a prima facie showing of "changing circumstances." The juvenile court clarified that it did not find that any of the Mother's evidence showed that her circumstances had changed in that she was prepared to address her children's needs,

14

especially in preventing sexual and/or physical abuse at the hands of the Father. Also, the court noted the Mother's continuing problem of her need to have the Father in her life, going as far as seeking a removal of the restraining order against him although he abused their children. The court further observed that in addition to failing to show changed circumstances, the Mother did not demonstrate a prima facie showing that her children's best interests would be served by returning them to her custody.

Against this backdrop, we cannot say the court abused its discretion in summarily denying the Mother's section 388 petition. To the contrary, we would struggle to find a record that more clearly indicates that a juvenile court appropriately exercised its discretion.

II

*TERMINATION OF PARENTAL RIGHTS*

A. Parent-Child Beneficial Relationship Exception

Section 366.26, subdivision (c)(1) allows termination of parental rights upon clear and convincing evidence of adoptability. An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and

15

child, and the child's particular needs . . . ." (*Id.* at p. 576.) The Mother has the burden to prove the facts supporting applicability of this exception to adoption. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

We review the juvenile court's ruling under the substantial evidence test (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576), viewing the evidence in the light most favorable to the prevailing party (*In re J. I.* (2003) 108 Cal.App.4th 903, 911).

The Mother does not challenge the juvenile court's finding that Alexis and Liliana are adoptable. Instead, she argues her parental rights should not have been terminated given the beneficial nature of her ongoing relationship with Alexis and Liliana. The Agency does not contest the juvenile court's finding that the Mother had regular visitations with the children. Nonetheless, the Agency asserts the Mother did not show she occupied a parental role in her children's lives and failed to show her relationship with the children outweighed the benefits of adoption. (See *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-577.) We agree.

Here, Liliana had been in out-of-home care since her birth. Alexis had been living with Josephine for two years and had become familiar with social workers removing her from the Mother on prior occasions and offering services to the family. Josephine had assisted the Mother in caring for the children for several years. The girls were in need of permanence and stability. (See *In re Ethan N.* (2004) 122 Cal.App.4th 55, 67; see also *In re Justice P.* (2004) 123 Cal.App.4th 181, 191 [a child's interest in having a stable and permanent home is paramount once the parents' interest in reunification is no longer at issue].)

16

In addition, at the section 366.26 hearing, Santana, the social worker, testified that he believed adoption was the preferred permanent plan for Alexis and Liliana. Santana's testimony was buttressed by the Agency's section 366.26 report dated February 18, 2014, in which Santana wrote: "Alexis and Liliana are placed with their maternal aunt, [Josephine] . . . . The girls are healthy, happy, developing well and their needs are being met. [Josephine] is an approved adoptive parent and she wants to adopt the girls."

Santana wrote about his observation of the Mother's visitations with Alexis and Liliana: "My observation is that [the Mother] helps out with the cooking, house chores, and watches Liliana. However, if the children have questions about anything or need to be disciplined, it is the aunt who does it as they do not mind the [M]other." Santana also noted that he did not "believe Liliana is strongly attached to her parents."

In an addendum report dated May 5, 2014, Santana discussed additional observations of visitations of the Mother. He acknowledged that Alexis had a positive relationship with her mother. Yet, he still believed adoption was in the best interest of Alexis and Liliana. "However, based on [all the] information, I believe that adoption is in Alexis and Liliana's best interest. They need a permanent, loving and stable family which will meet all their daily physical and emotional needs like their current

17

relative placement is doing. Adoption provides them with more benefits than occasional contact with their parents."[4]

In finding that the parent-child beneficial relationship exception did not apply, the juvenile court placed great weight on Santana's evaluation. The court also stressed that the Mother had not proved the benefit of maintaining the parent-child relationship outweighed the benefits of adoption or the children would be harmed if her parental rights were terminated. The court explained:

> "[T]he court gives significant weight to Mr. Santana's opinion and testimony. I find him to be very experienced, very balanced. And I note, particularly, Mr. Santana, has, perhaps, more than other social worker[s], a great and heightened appreciation for the importance of parent-child bond and sibling bonds and importance of family. And I find his reports to have been very fair in acknowledging the interaction between siblings and between parents and their children.
>
> "And I – I note and I rely on his assessment as to what he's observed in the home and what has been reported with respect to the home. While the children may have – have contact with their mother in the maternal aunt's home, it is the maternal aunt, [Josephine], who acts as the parent.
>
> "And while [the] [M]other is – is certainly a support figure, she does not hold a parental role as to – as to either child.
>
> "And I do not find – even if minds wiser than mine were to re-assess this relationship, although I am in large measure basing it as well on having personally observed Mr. Santana testify in the courtroom, I do not find on this record that there's any evidence that supports that the benefit to maintaining, for either Liliana or Alexis, the parent-child relationship with the [M]other [that] outweighs adoption.

---

4      Both the February 18 and May 5 reports were received into evidence during the section 366.26 hearing.

"I note that it has not been proved that severing the natural parent-child relationship would deprive either child a substantial positive emotional attachment such that Liliana or Alexis would be greatly harmed. There is no evidence that they would be greatly harmed."

The juvenile court was entitled to find the social worker's opinion credible, and to give great weight to his assessment. (*In re Casey D., supra,* 70 Cal.App.4th at p. 53.) The Mother offers no argument why it was inappropriate for the juvenile court to rely on Santana's opinion here. Nor does she explain why Santana's opinion is invalid or unreliable.

In addition, we observe that the Mother has failed to explain how substantial evidence does not support the juvenile court's finding that the parent-child beneficial relationship exception does not apply. Instead, the Mother argues substantial evidence demonstrated that the relationship between her and Alexis and Liliana was parental in nature and that the relationship was of benefit to the girls. The Mother points out that she was in the home almost daily watching Liliana, feeding her, bathing her, and changing her diapers. She also maintains the social worker reported Alexis had a positive relationship with the Mother.[5] However, the Mother's arguments underscore that she misapplies the standard of review here. We do not attempt to resolve conflicts in the evidence or evaluate the weight of the evidence; rather, we must draw all reasonable inferences in support of the court's findings and affirm the order even if there is

---

[5] The evidence of which the Mother relies also highlights the weakness of her position. None of the evidence she cites shows that she occupied a parental role in the girls' lives, the benefit of continuing her relationship with her daughters outweighed the benefits of adoption, or the termination of her parental rights would greatly harm the children.

19

substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) We review the record for substantial evidence that supports the juvenile court's finding that the parent-child beneficial relationship exception did not apply. As we discuss above, the evidence supporting the juvenile court's finding is plentiful.

## B. The Sibling Relationship Exception

Section 366.26, subdivision (c)(1)(B)(v), provides an exception to termination of parental rights when termination would substantially interfere with the child's sibling relationship and the severance of the relationship would be so detrimental to the child to outweigh the benefits of adoption. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 951-953; § 366.26, subd. (c)(1)(B)(v).) The juvenile court must "balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*In re L. Y. L.*, *supra*, at p. 951, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Factors to be considered include whether the children were raised in the same home; whether they shared significant common experiences or have existing close and strong bonds; and whether ongoing contact is in the child's best interests, including his or her-long term emotional interests, as compared to the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v).) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Examining the evidence most favorable to the order, we conclude substantial evidence supports the court's finding the Mother did not meet her burden of proving the exception. (*In re L. Y. L., supra*, 101 Cal.App.4th at pp. 947, 952.) The court found termination of parental rights would not cause a substantial interference with the sibling relationship: "[I]t is unlikely, highly unlikely if these children are adopted that their contact with siblings will be terminated. The maternal aunt still holds that familial relationship. She has been throughout very conscientious and mindful of permitting visitation and contact, and she really has been [providing] an extraordinary village experience, a familial village." Moreover, even if the sibling relationship was severed by adoption, the court found the benefits of adoption "heavily outweigh the – the maintenance of the sibling relationship and those benefits in this particular case." The court further noted there was no evidence that termination of the sibling relationship would be detrimental to either Alexis or Liliana.

The Mother does not directly address these findings by the juvenile court, but instead, focuses on the sibling bond among all her children. In doing so, she neglects to show us that substantial evidence does not support the juvenile court's decision. And she fails to provide us any citation to the record where she offered evidence that the benefits of the sibling relationship outweigh the benefits of adoption or that Alexis or Liliana would suffer detriment from the termination of any sibling relationship. We thus agree with the juvenile court that the Mother did not satisfy her burden of showing that the sibling relationship exception applies.

DISPOSITION

The orders are affirmed.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.